USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __7/27/2021__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

MICHAEL OBREMSKI,                          :
                                           :
                   Plaintiff,              :            **OPINION & ORDER**
                                           :
           -against-                       :            20-CV-3902 (JLC)
                                           :
KILOLO KIJAKAZI,[1]                        :
Commissioner, Social Security Administration, :
                                           :
                   Defendant.              :
                                           :
----------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Michael Obremski seeks judicial review of a final determination by defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, denying Obremski's application for disability insurance benefits under the Social Security Act. The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Obremski's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded for further proceedings.

## I. BACKGROUND

### A. Procedural History

On November 30, 2016, Obremski filed an application for Social Security Disability benefits ("SSD"), alleging a disability onset date of November 4, 2016.

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this action.

Administrative Record ("AR"), Dkt. No. 14, at 226, 356–62.[2]  Obremski

subsequently filed a claim for Supplemental Security Income benefits ("SSI") on

June 8, 2018 that was consolidated with the SSD claim.[3]  *Id.* at 27.  Obremski

alleged he was unable to work due to an impairment of his "right hand (no blood

flow)," inflammatory arthritis, and a history of asthma.  *Id*. at 227, 231–32.

The Social Security Administration ("SSA") denied Obremski's claim on

February 23, 2017.  *Id.* at 226–35.  On March 18, 2017, Obremski requested a

hearing before an Administrative Law Judge ("ALJ").  *Id.* at 244–46.  On November

7, 2018, Obremski, represented by counsel, appeared and testified before

Administrative Law Judge ("ALJ") Michelle Allen.  *Id.* at 196–225.  In a decision

dated January 23, 2019, the ALJ found Obremski not disabled from November 4,

2016 to the date of decision and denied his claims.  *Id.* at 17–31.  Obremski sought

review of the ALJ's decision by the Appeals Council, which was subsequently denied

on March 19, 2020, rendering the ALJ's decision final.  *Id.* at 1–3.

Obremski timely commenced this action on May 19, 2020, seeking judicial

review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Complaint,

("Compl."), Dkt. No. 1.  The Commissioner answered Obremski's complaint by filing

the administrative record on November 10, 2020.  Dkt. No. 14.  On February 8,

2021, Obremski moved for judgment on the pleadings and submitted a

---

[2] The page number refers to the sequential numbering of the Administrative Record
provided on the bottom right corner of the page, not the number produced by the
Electronic Case Filing (ECF) System.

[3] Obremski's SSI application was not included in the record but was adjudicated by
the ALJ in the decision.  *See* AR at 27.

memorandum of law in support of his motion.  Notice of Motion, Dkt. No. 17;

Memorandum of Law in Support of Plaintiff's Motion for Judgement on the

Pleadings ("Pl. Mem."), Dkt. No. 18.  The Commissioner cross-moved for judgment

on the pleadings on May 25, 2021 and submitted a memorandum in support of her

cross-motion.  Notice of Cross-Motion, Dkt. No. 23; Memorandum of Law in

Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of

the Commissioner's Cross-Motion for Judgment on the Pleadings ("Def. Mem."),

Dkt. No. 24.  On June 11, 2021, Obremski submitted reply papers.  Reply

Memorandum of Law in Support of Plaintiff's Motion for Judgment on the

Pleadings ("Pl. Reply"), Dkt. No. 25.[4]

### B.  The Administrative Record

#### 1.  Obremski's Background

Obremski was born on June 14, 1972.  AR at 226.  He was 44 years old on his

alleged onset date of disability.  *Id.* at 227.  At the time of the hearing, Obremski

lived in Callicoon, New York with his father and step-mother.  *Id.* at 202.  He has

an eleventh-grade education and has prior work history as a painter.  *Id.* at 204–05.

Obremski testified that a blood clot (occlusion) in his right hand and long-

term rheumatoid arthritis have rendered him unable to work since November 4,

---

[4] In her motion papers, the Acting Commissioner provides no "Statement of Facts,"
but merely refers the Court to the administrative record.  Def. Mem. at 1.  This is
not an acceptable practice.  At a minimum, the Commissioner should indicate
whether she has any disagreement with the claimant's factual recitation in his
moving papers, and if so, identify what those disputes are.  It is essential that the
Commissioner assist in the process of streamlining the record in order to facilitate
meaningful review.

2016.  *Id.* at 211–12.  He had surgery as a result of the right hand occlusion, resulting in numbness in his middle, fourth, and pinkie fingers from the first knuckle to the tip.  *Id.* at 213–14.  He also testified to needing thermal gloves to avoid pain in his right hand.  *Id.* at 215.

Obremski claims that he has suffered from rheumatoid arthritis for 14 years.  *Id.* at 209.  As a result, he has experienced swelling and pain in his right hand and both his shoulders and knees bilaterally.  *Id.* at 207–08, 211.  He also claims to suffer from diabetes, vertigo, fatigue, and frequent infection as a result of the medications he takes for his conditions.  *Id.* at 208, 216.  Obremski stated at the hearing that he was taking Prednisone,[5] Methotrexate,[6] and Enbrel[7] while he was working, but has begun taking additional medications since he stopped working.  *Id.* at 216–17.  He reported getting pneumonia in the summer, which he attributed to the immunosuppressant medications he takes for his rheumatoid arthritis.  *Id.* at 218.

---

[5] Prednisone is used to treat rheumatoid arthritis by reducing swelling, redness, and by changing the way the immune system works.  *Prednisone*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a601102.html (last visited July 26, 2021).

[6] Methotrexate is used to treat certain types of cancer and rheumatoid arthritis by decreasing the activity of the immune system.  *Methotrexate,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a682019.html (last visited July 26, 2021).

[7] Enbrel, the brand name of Etanercept Injection, is prescribed to treat rheumatoid arthritis by blocking the action of the tumor-necrosis factor, a substance in the body that causes inflammation.  *Etanercept Injection,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a602013.html (last visited July 26, 2021).

In a Disability Report from December 12, 2016, Obremski reported needing assistance to dress himself, use buttons or zippers, and bathe, as he is unable to use his right hand.  *Id.* at 409.  He also reported that he cannot be exposed to hot or cold water.  *Id.*  Obremski noted that he was only able to help with chores that could be accomplished using one hand, such as wiping the countertops.  *Id.* at 410.  Based on the 2016 report, Obremski's daily activities and hobbies include "watching tv [and] listening to music."  *Id.* at 412.  As of November 7, 2018, Obremski's daily activities were limited by exhaustion and difficulty gripping.  *Id.* at 215–16.

### 2.  Medical Opinion Evidence

#### a.  Avram Goldberg, M.D. – Rheumatologist

Avram Goldberg, M.D., a rheumatologist at NYU Langone Medical Center, has treated Obremski for his rheumatoid arthritis since 2013.  *Id.* at 566–67. During his first visit on September 10, 2013, Obremski complained of pain in his knees and in his left elbow and left hand.  *Id.*  On December 3, 2013, Dr. Goldberg prescribed Meloxicam and Percocet for pain management and Prednisone for rheumatoid arthritis.  *Id.* at 569.[8]  Obremski continued to receive treatment from Dr. Goldberg from September 2013 through November 2016, and consistently complained of pain in his wrists, elbows, shoulders, and knees, as well as fatigue. *See, e.g., id.* at 476, 484, 489, 492, 500, 504, 510, 520, 527, 534, 541, 548.

---

[8] Meloxicam is a prescription used to relieve pain, tenderness, swelling, and stiffness caused by rheumatoid arthritis.  *Meloxicam,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a601242.html (last visited July 26, 2021).

On November 5, 2016, a CT scan of Obremski's right upper extremity, including the right arm and chest, demonstrated occlusion of the right ulnar artery in the distal third of the forearm.  *Id.* at 447–49.  Obremski subsequently underwent a procedure to clear the occlusion, although the surgical records are not included in the record.  *See* Pl. Mem. at 3.

On April 20, 2017, Obremski returned to Dr. Goldberg, reporting pain in his right hand and elbow.  *Id.* at 581.  Dr. Goldberg conducted a physical exam, noting small effusions in the elbows, some pain with range of motion, and mild knee pain with range of motion.  *Id.* at 582.

### b.  Rajeev Dayal, M.D. – Vascular surgeon

After the surgery to clear the occlusion, Rajeev Dayal, M.D., a vascular surgeon at New York Presbyterian Queens, examined Obremski's right upper extremity cyanosis on November 6, 2016.  *Id.* at 627.[9]  During a follow up on November 29, 2016, Dr. Dayal noted third and fourth fingertip hyperesthesia on Obremski's right hand and coolness when exposed to cold temperatures or pressure; the third fingertip in particular had an area of "blueness."  *Id.* at 461–63.[10]  In a physical examination, Dr. Dayal noted an inability to palpate the right ulnar artery pulse, a warm right hand and fingertips as compared to the left hand, a slightly

---

[9] Cyanosis refers to a bluish cast to the skin and mucous membranes, and is usually caused by low blood oxygen levels.  *Peripheral Cyanosis*, HEALTHLINE, https://www.healthline.com/health/peripheral-cyanosis (last visited July 26, 2021).

[10] Hyperesthesia is an increase in the sensitivity of any senses, such as sight, sound, touch, and smell.  *Hyperesthesia*, HEALTHLINE, https://www.healthline.com/health/hyperesthesia (last visited July 26, 2021).

cyanotic third fingertip with a 2mm wound, and right medial wrist incision. *Id.* at 463–64. Based on his report and physical examination, Dr. Dayal diagnosed upper limb ischemia. *Id.*[11]

In an incomplete report dated December 22, 2016, Dr. Dayal opined that Obremski's ability to perform work-related physical activities is limited. *Id.* at 460.[12] Specifically, he stated Obremski is "unable to work due to loss of function/circulation to upper extremity," is limited in his ability to push/pull, and has manipulative limitations in his upper extremities. *Id.*

In an Upper Extremity Assessment dated March 7, 2017, Dr. Dayal reported treating Obremski monthly beginning on November 7, 2016 after diagnosing him with an ulnar artery occlusion, based on diagnostic test results from an angiogram of the right upper extremity and a noninvasive vascular study. *Id.* at 576–80. This diagnosis was also supported by clinical evidence of decreased sensation, limitation of motion, muscle atrophy, paresthesia,[13] reduced grip strength, tenderness, swelling, redness of the right extremity, as well as hyperesthesia of the right third,

---

[11] Ischemia is a condition in which a part of the body does not receive enough blood and oxygen due to a build-up or blockage in the arteries. *What is Ischemia?*, WEBMD, https://www.webmd.com/heart-disease/what-is-ischemia (last visited July 26, 2021).

[12] Dr. Dayal did not complete the entire form, omitting the first page that included sections for "History and Subsequent Course," "Clinical Findings," and other background information such as height, weight, and blood pressure. AR at 459. However, he filled out the section regarding Obremski's ability to do work-related physical activities. *Id.* at 460.

[13] Paresthesia is the burning or prickling sensation commonly affecting the hands, arms, legs, or feet. Chronic paresthesia can cause stabbing pain, clumsiness. *What is Paresthesia?,* HEALTHLINE, https://www.healthline.com/health/paresthesia#outlook (last visited July 26, 2021).

fourth, and fifth fingertips.  *Id.*  Obremski's primary symptoms were right upper arm ischemia, pain and hyperesthesia in the third, fourth, and fifth fingertips and severe cold intolerance, aggravated by touch, movement, and cold temperatures.  *Id.* at 577.  Dr. Dayal noted that Obremski's pain resulted in altered pain processing, decreased activity, difficulty with activities of daily living, and difficulty performing fine or gross movements, resulting in extreme limitations ("never/rare use") in his ability to use his right upper extremities to handle objects and some limitations ("occasional use") in his ability to use his right upper extremities to reach, push, or pull.  *Id.* at 577–78.  He also determined that Obremski could occasionally lift and carry up to five pounds.  *Id.* at 578.  Dr. Dayal opined that Obremski's symptoms would likely increase if he was placed in a competitive work environment and that his experience of pain, fatigue, and other symptoms would be severe enough to interfere with his attention and concentration occasionally (up to a third of an eight-hour workday).  *Id.* at 579.

### c.  Gabriel H. Jung, M.D. – Treating internist

Gabriel H. Jung, M.D., a treating internist at Queens Medical Associates, completed an undated medical report with a fax transmittal date stamp of December 13, 2016.  *Id.* at 443.  Dr. Jung determined that Obremski's work-related physical activities are limited due to the lack of sensation in his right hand, and that he can only lift or carry up to 10 pounds or as tolerated, can stand and/or walk for up to two hours per day or as tolerated, and can sit for up to six hours per day.  *Id.* at 443.  In a letter dated January 10, 2017, Dr. Jung specified that Obremski "has sensory loss in median nerve distribution in his right (dominant) hand," and

"therefore is limited in his ability to grasp, push/pull, lift/carry, or do other activities with [his right] hand." *Id.* at 465.

### d. Jeffrey Gross, M.D. – Pain management and rehabilitation specialist

Jeffrey Gross, M.D. at NYU Langone PMR Associates – Union Square, evaluated Obremski on March 23, 2018 and reviewed his medical records from Dr. Dayal and Dr. Goldberg. *Id.* at 615. Obremski complained of pain in both knees, his right elbow, fingers of both hands, both wrists, and his left shoulder, with symptoms of pain exacerbated by use or prolonged sitting, standing, and walking. *Id.* A physical examination revealed decreased range of motion in the right elbow, tenderness of the posterior and lateral right elbow, decreased range of motion in the left shoulder, and tenderness of the left ulnar wrist and the metacarpophalangeal ("MCP") joint of the left medial fingers. *Id.* at 615–16. Obremski retained full range of motion for both wrists and hands. *Id.* at 615. The exam revealed that both the right and left knee had crepitus, and the left knee had tenderness of the medial joint line and lateral joint line. *Id.* at 616.[14] Obremski's strength in his upper and lower extremities was normal except for decreased bilateral grip strength, which measured at four out of five. *Id.* Dr. Gross diagnosed rheumatoid arthritis affecting multiple joints, including both wrists, hands, knees, the right elbow, and the left shoulder. *Id.* Based on the physical examination and record review, Dr. Gross

---

[14] Crepitus is "the grinding, creaking, cracking, grating, crunching, or popping that occurs when moving a joint." *What Is Creptius?*, Arthritis-Health, available at https://www.arthritis-health.com/types/general/what-crepitus (last visited July 26, 2021).

reported that Obremski was "incapable of performing activities on a sustained or regular basis in a normal competitive work environment due to his chronic pain," concluding that he is therefore "disabled for work."  *Id.*

Dr. Gross completed a Rheumatoid Arthritis Impairment Questionnaire on the same day, March 23, 2018.  *Id.* at 617.  Dr. Gross observed pain, inflammation, and/or limitations of movement in Obremski's left shoulder, both knees, right elbow, right and left fingers, and both wrists.  *Id.*  Dr. Gross opined that Obremski had marked limitations, finding that he is essentially precluded from grasping, turning, and twisting objects with his right and left hands, as well as using his right fingers and hand for fine manipulation.  *Id.* at 618.  Dr. Gross further opined that Obremski was only moderately limited in using his left fingers and hand for fine manipulation or using either arm for reaching (including overhead).  *Id.*  Obremski had reduced range of motion in his right elbow, both knees, and left shoulder, reduced grip strength bilaterally, and tenderness in both knees, the left wrist/fingers, the left shoulder, and the right elbow.  *Id.*  Based on the impairments listed, Dr. Gross indicated that Obremski could occasionally lift and carry up to 10 pounds but could only sit, stand, or walk for up to one hour in an eight-hour workday, as it would be necessary or medically recommended to not sit continuously in a work setting.  *Id.* at 620–21.

### e.  Catskill Regional Medical Center

On May 15, 2018, Obremski established primary care treatment at Catskill Regional Medical Center when he was evaluated by Lauren Roman, M.D.  *Id.* at 76. Dr. Roman noted Obremski's new onset diabetes as a result of taking Prednisone to

treat his rheumatoid arthritis and re-affirmed diagnoses for moderate persistent allergic asthma and rheumatoid arthritis involving multiple sites with positive rheumatoid factor.  *Id.* at 76, 78.  Dr. Roman prescribed Singulair,[15] Symbicort,[16] and Albuterol[17] for the asthma.  *Id.* at 78.

On June 18, 2018, Obremski returned to Catskill Regional Medical Center complaining of dizziness spells and right rib pain.  *Id.* at 88.  On June 21, 2018, he was admitted into the emergency department with a fever.  *Id.* at 667–70.  A CT scan revealed pneumonia in his left upper lobe extending from the left hilar region to the left lateral lung convexity.  *Id.* at 672.  Obremski was treated by Dr. Roman for a check-in one month later on July 19, 2018.  *Id.* at 754.  At that visit, Dr. Roman reported significant improvement in his lungs.  *Id.*

On June 26, 2018, Obremski was evaluated by Jowairiyya S. Ahmad, M.D., a rheumatologist at Catskill Regional Medical Center, for rheumatoid arthritis.  *Id.* at 114.  A physical examination revealed Obremski's discomfort with range of motion in both his shoulders, tenderness in the right elbow epicondyles, tenderness on

---

[15] Singulair, the brand name for Montelukast, is "used to prevent wheezing, difficulty breathing, chest tightness, and coughing caused by asthma." *Montelukast,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a600014.html (last visited July 26, 2021).

[16] Symbicort, the brand name for Budesonide Oral Inhalation, is "used to prevent difficulty breathing, chest tightness, wheezing, and coughing caused by asthma." *Budesonide Oral Inhalation,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a699056.html (last visited July 26, 2021).

[17] Albuterol is used to treat "difficulty breathing, wheezing, shortness of breath, coughing, and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease." *Albuterol Oral Inhalation,* U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a682145.html (last visited July 26, 2021).

range of motion and synovial thickening of his right wrist and first through fifth
MCP joints. *Id.* at 119. Dr. Ahmad prescribed Prednisone and ordered further
laboratory tests. *Id.* at 120.

On August 3, 2018, Obremski was seen by Mark Bele, D.O., a rheumatologist
at Catskill Regional Medical Center. *Id.* at 157–60. A physical examination
revealed swelling and tenderness in both wrists and elbows. *Id.* at 159. Dr. Bele
diagnosed immunodeficiency due to treatment with immunosuppressive medication
and rheumatoid arthritis involving multiple sites with positive rheumatoid factor.
*Id.* at 160.

### f.  Iqbal Teli, M.D. – SSA Consultative Examiner

Iqbal Teli, M.D., a physical medicine and rehabilitation doctor from
Industrial Medicine Associates, P.C., conducted a consultative internal medicine
examination of Obremski on February 21, 2017, without reviewing his prior medical
records. *Id.* at 571–73. Obremski complained of "multiple joint pains on and off"
that occur about two to three times a week with an intensity of nine out of ten, and
a history of asthma since 2011. *Id.* He also complained of pain in the fingers upon
touching with an intensity of four out of ten, as well as numbness of the right
fingers. *Id.* Obremski also informed Dr. Teli that he needed help to shower and
dress himself. *Id.*

A physical examination revealed decreased range of lumbar spine motion to
20 degrees flexion on the right, lateral rotation to 25 degrees on the right, full range
of motion of shoulders, elbows, forearms, and wrists bilaterally. *Id.* at 572. The
exam also revealed (1) tenderness and decreased touch sensation on the right

hand's first, second, and third fingers, (2) decreased pain sensation over the left
hand, and (3) five out of five strength in the upper and lower extremities.  *Id.* at
572.  His right grip strength measured four out of five, and left grip strength
measured five out of five.  *Id.* at 573.  Dr. Teli observed that Obremski did not need
assistance changing for the exam or getting on and off the exam table.  *Id.* at 572.
Dr. Teli diagnosed Obremski with a "history of" rheumatoid arthritis, nerve damage
due to ischemia in right forearm, pain over the right hand, bronchial asthma, and
hypertension.  *Id.* at 573.  Dr. Teli recommended Obremski avoid dust and other
respiratory irritants due to his history of asthma and recommended mild
restrictions for Obremski's use of his right hand.  *Id.*

### 3.  ALJ Hearing

Obremski appeared before ALJ Allen in Queens, New York on November 7,
2018, and was represented by counsel.  *Id.* at 199.  Obremski testified that he
received up to eleventh grade education and lived in Callicoon, New York with his
father and step-mother at the time of the hearing.  *Id.* at 202, 204.  With respect to
his employment history, Obremski testified that he worked as a bridge painter for
many years prior to his disability.  *Id.* at 205.  He stated that he had not worked
since he became disabled in November 2016 due to the blood clot in his ulnar artery.
*Id.* at 204, 207.  Obremski received disability payments from his former employer,
L&L Painting Company, in 2017.  *Id.* at 204.

During the hearing, Obremski's counsel clarified that Obremski suffered from
significant pain and loss of use of the right hand and long-term rheumatoid

arthritis that has worsened and affects his right hand, elbow, shoulder, left shoulder, and both knees bilaterally.  *Id.* at 207–08.  He also explained that Obremski's medications (such as Methotrexate, Hydrocodone, and Prednisone) subject him to frequent infections, lung scarring, diabetes (induced by the Prednisone), and vertigo.  *Id.* at 208.  Obremski stated he was on Prednisone, Methotrexate, and Enbrel while he was working, but now takes 13 different medications.  *Id.* at 217.  He reported getting pneumonia in the summers, which he attributed to the immunosuppressive medications he takes for his rheumatoid arthritis.  *Id.* at 218.  Obremski testified that the Methotrexate, a medication for rheumatoid arthritis, was recently changed from pills to an injection.  *Id.* at 209.

Prior to ending his employment, Obremski stated that his arthritis caused him to miss approximately eight to ten days of work per month, but that he was able to maintain his job because of his long working relationship with his employer. *Id.* at 211–12.  Obremski testified that his knee pain affects his ability to move his knees and how long he can stand, sit, and walk.  *Id.* at 212–13.  The drive from his home in Sullivan County to Jamaica, Queens took approximately three hours and 45 minutes, during which Obremski reported stopping three times every hour.  *Id.* at 213.  Obremski also testified to experiencing numbness in his fingers, which led him to go to the hospital and have surgery.  *Id.* at 213–14.  He reported still experiencing numbness on the right third, fourth, and fifth fingers from the knuckle up.  *Id.* at 214.  He explained he must wear thermal gloves because cold weather causes him pain and affects his ability to grab and hold things.  *Id.* at 215.

Obremski reported that when he tries to perform daily activities such as folding laundry, it is difficult for him to grip his clothes because of his swollen hands and that his fatigue requires him to rest for at least an hour after completing tasks.  *Id.* at 216.  Obremski testified that he experiences exhaustion daily and has to lie down three times a day, particularly after any activity such as walking from one side of the house to the other.  *Id.* at 218–19.

Joseph Atkinson, a vocational expert, also testified at the hearing.  *Id.* at 219–24.  The ALJ first described to Atkinson a hypothetical individual who can perform light work; is limited to frequent reaching overhead and all other directions; is limited to frequent handling and frequent fingering bilaterally; is limited to frequent feeling with the right upper extremity of the right hand; is limited to occasionally climb ramps and stairs but can never climb ladders, ropes, and scaffolding; should not crawl or kneel; is limited to only occasional stooping and crouching; is unable to work at unprotected heights or with moving mechanical parts; can occasionally operate a motor vehicle; and who should not be exposed to dust, odors, fumes, pulmonary irritants, or extreme cold.  *Id.* at 220.  The ALJ further described this hypothetical person as someone who will need to miss work one day a month.  *Id.*  Atkinson testified that this hypothetical person could not perform any of Obremski's past work.  *Id.*  Atkinson then clarified that if the hypothetical person could not be exposed to dust fumes, that would rule out any work in the national economy.  *Id.* at 221.  The ALJ then asked Atkinson to assume that the hypothetical person is a person of Obremski's age, education, and past

history of work and can have concentrated exposure to dust and fumes. *Id.* Atkinson responded that several occupations requiring only a light work level exist for that profile, including those of a mail clerk, cashier, and office helper. *Id.*

The ALJ then changed the hypothetical person to being capable of a light exertional level and limited to occasional handling and fingering for the dominant extremity. *Id.* at 222. Atkinson testified that a few options at the light exertional level exist for that profile, including usher and furniture rental consultant. *Id.* The ALJ then asked Atkinson to assume that the hypothetical person was limited to sedentary work, to which Atkinson responded that there would be no sedentary jobs that exist for that hypothetical profile. *Id.*

The ALJ then described a new hypothetical person who had the same limitations as above and was limited to sedentary work and frequent handling and fingering. *Id.* Atkinson testified that several jobs existed for that profile, including document preparer, order clerk, and charge account clerk. *Id.* at 223.

Next, Atkinson testified that the tolerated time off task is 10% of the workday in addition to normal breaks or six minutes per hour usually in small increments. *Id.* Atkinson testified that a hypothetical person who was required to take unscheduled breaks of ten minutes every hour would not be able to perform the jobs identified above. *Id.* at 223–24. Finally, Atkinson stated that an individual who could rarely use their dominant hand would be unable to perform any of the jobs identified. *Id.* at 224.

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it

might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing."  42 U.S.C. § 405(g).  However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed,

the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his ability to work.  20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id.*; 20 C.F.R. § 404.1520(d).  If not, the Commissioner continues to the fourth step and determines whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation

marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits."  *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity."  *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record."  *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law." (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999))).  The ALJ must develop the record even where the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*,

569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation marks omitted).[18]  A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the

---

[18] Revisions to the regulations in 2017 included modifying 20 C.F.R. § 404.1527 to clarify and add definitions for how to evaluate opinion evidence for claims filed before March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  Accordingly, this opinion and order applies the regulations that were in effect when Obremski's claims were filed with the added clarifications provided in the 2017 revisions.

medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [are] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate).  As a result, "the 'treating physician rule' is

inextricably linked to a broader duty to develop the record.  Proper application of

the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly

how these opinions relate to the final determination."  *Lacava v. Astrue*, No. 11-CV-

7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec.

19, 2012).

To determine how much weight a treating physician's opinion should carry,

the ALJ must consider the "*Burgess* factors" outlined by the Second Circuit: "(1) the

frequen[cy], length, nature, and extent of treatment; (2) the amount of medical

evidence supporting the opinion; (3) the consistency of the opinion with the

remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*,

925 F.3d at 95–96 (citation omitted); *see also Burgess*, 537 F.3d at 129; 20 C.F.R. §

404.1527(c)(2).  This determination is a two-step process.  "First, the ALJ must

decide whether the opinion is entitled to controlling weight." *Estrella*, 925 F.3d at

95.  Second, if, based on these considerations, the ALJ declines to give controlling

weight to the treating physician's opinion, the ALJ must nonetheless

"comprehensively set forth reasons for the weight" ultimately assigned to the

treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's

opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling weight, "[a]n ALJ's failure to 'explicitly' apply these '*Burgess* factors' when [ultimately] assigning weight at step two is a procedural error."  *Estrella*, 925 F.3d at 96 (quoting Selian, 708 F.3d at 419–20).  The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

Crucially, "an ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)).  However, the Court need not remand the case if the ALJ only committed harmless error, *i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion."  *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d.  Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court.  *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  "[A]s with any finding of fact, '[i]f the

Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

### B. The ALJ's Decision

In her January 23, 2019 decision, the ALJ concluded that Obremski was not disabled from November 4, 2016 through the date of the decision. AR at 18. As a preface to her decision, the ALJ described her attempts to retrieve all relevant medical records from Obremski, and noted that the records from Crystal Run Medical were submitted late and therefore were inadmissible. *Id*. at 17.

At step one of the five-step inquiry, the ALJ found that Obremski has not engaged in substantial gainful activity since his alleged onset date and observed that the work disability insurance payments he had received in 2017 do not qualify as substantial gainful activity. *Id*. at 20. At step two, the ALJ found that Obremski had the following severe impairments: right hand ischemia, rheumatoid arthritis, and asthma. *Id*. She found that Obremski's diagnosis of high cholesterol and hypertension were not severe, as a review of the record did "not reveal any indication that [either condition] individually or in combination have more than a minimal effect on [his] ability to do basic physical or mental work activities." *Id*. At

step three, the ALJ found that none of Obremski's impairments met or equaled the severity of any listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, including, in particular, listings contained in 1.00 (Musculoskeletal System). *Id*.

Prior to evaluating step four, the ALJ determined Obremski's residual functional capacity as follows:

> [Obremski] can perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can frequently reach overhead and in all other directions with both upper extremities. The claimant can handle and finger items frequently with both hands. The claimant can climb ramps and stairs occasionally, never climb ladders, ropes, or scaffolds – yet stoop and crouch occasionally, but never kneel or crawl. The claimant can never work at unprotected heights, never with moving mechanical parts, and can occasionally operate a motor vehicle. Lastly, the claimant cannot work in dust, odors, fumes, and pulmonary irritants or extreme cold and would be absent from work one day a month due to symptoms related to rheumatoid arthritis.

*Id*. at 21. In making this determination, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence." *Id*.

The ALJ also weighed the medical evidence of Obremski's treating physicians. The ALJ afforded "some weight" to Dr. Jung's November 2016 opinion that Obremski's impairments limit his ability to lift and carry, but gave less weight to his opinion on the restrictions for standing, walking, or sitting as it was "somewhat vague" and relied significantly on Obremski's subjective complaints. *Id*. at 23. The ALJ afforded "great weight" to Dr. Jung's subsequent assessment in January 2017, in which he opined that Obremski is limited in his ability to grasp,

push, pull, lift, carry, or do other activities with his hand, but was able to sit, stand, or walk "as tolerated." *Id.*

The ALJ afforded "little weight" to Dr. Dayal's first assessment from December 22, 2016, which characterized Obremski as "unable to work" due to loss of function and circulation to the upper extremity. *Id.* In the ALJ's view, this assessment failed to provide "a specific function-by-function analysis" of Obremski's abilities and was too vague to account for sedentary work environments with non-exertional limitations. *Id.* The ALJ afforded "some weight" to Dr. Dayal's second assessment from March 7, 2017 regarding Obremski's limitations to the upper extremities, but accorded less weight to Dr. Dayal's assessment that Obremski had no or rare use of the right hand, as the record as a whole did not consistently support such a finding. *Id.*

The ALJ afforded Dr. Teli's opinion "some weight" with respect to Obremski's severe impairments. *Id.* at 24. However, the ALJ found that Dr. Teli had not considered Obremski's impairments "to the extent that the evidence provides," such as rheumatoid arthritis, his treatment regimen, and his subjective complaints of pain. *Id*. The ALJ afforded "some weight" to Dr. Gross's assessment because some of his opinions, such as an assessment that Obremski was extremely limited in sitting, walking, and standing, were not consistent with the record. *Id.*

The ALJ also found that Obremski's testimony regarding the nature, intensity, persistence, and limiting effects of his symptoms was not consistent with the medical signs, laboratory findings, or other evidence in the record. *Id.* The ALJ

found that the majority of Obremski's treatment has been "essentially routine and/or conservative in nature" and that the required medication to alleviate pain or other symptoms would not prevent Obremski from engaging in the RFC the ALJ had identified. *Id.* at 24–25. Additionally, the ALJ found that Obremski's reported symptoms and related limitations were not consistent with the evidence in the record as a whole. *Id.* at 25. The ALJ found that throughout the record, physical examinations revealed "non-tenderness" and "good range of motion in the elbows, right wrist, right hand, and shoulder." *Id.*

At step four, the ALJ found that Obremski was unable to perform any past relevant work. *Id.* At step five, after considering the testimony of the vocational expert and Obremski's demographic information, the ALJ concluded that there were jobs that exist in significant numbers in the national economy that he could perform, such as order clerk, document preparer, and charge account. *Id.* at 25–26. Accordingly, the ALJ concluded that Obremski was not disabled from November 4, 2016 through the date of her decision. *Id.* at 26.

### C. Analysis

Obremski contends this case should be remanded for two reasons: (1) the ALJ failed to properly weigh the medical opinion evidence and evaluate his RFC; and (2) the ALJ failed to properly evaluate his subjective statements. Pl. Mem. at 11, 19. The Commissioner counters that the ALJ's decision should be affirmed because: (1) the ALJ's decision is supported by substantial evidence (Def. Mem. at 3–10); (2)

the ALJ properly weighed the medical opinions (*Id.* at 10–16); and (3) the ALJ's credibility finding is supported by substantial evidence (*Id.* at 16–19).

### 1. The ALJ Did Not Properly Apply the Treating Physician Rule

### a. The ALJ Failed to Properly Weigh Dr. Dayal's Opinions

Obremski argues that the ALJ erroneously applied the treating physician rule by giving only "some weight" to Dr. Dayal's opinions.  Pl. Mem. at 11–12. Specifically, Obremski argues the ALJ failed to set forth the reasons for the weight she assigned to the opinions.  *Id.* at 14.  The Commissioner responds that the ALJ provided the requisite "good reasons" for assigning less weight to Dr. Dayal's opinions, citing the ALJ's statement that she "considered opinion evidence in accordance with the requirements of 20 C.F.R. 404.1527 and 416.927."   Def. Mem. at 11.  Specifically, the Commissioner argues that the ALJ properly discounted Dr. Dayal's first assessment in December 2016 because: (1) the questionnaire he filled out was vague and largely left blank; (2) the opinion on disability and Obremski's ability to work is reserved to the Commissioner; and (3) it did not quantify the limitations as a "function-by-function" analysis.  *Id.*  The Commissioner further contends that the ALJ properly discounted Dr. Dayal's second assessment in March 2017 as his findings that Obremski could never or rarely use his right hand were inconsistent with clinical examinations and the record as a whole.  *Id.* at 11–12.

After reviewing the record, the Court concludes that the reasons given by the ALJ in assigning less-than-controlling weight to Dr. Dayal's opinions were inadequate.  As an initial matter, it is undisputed that Dr. Dayal, who treated Obremski from 2016 to 2017 regularly after his occlusion surgery, is Obremski's

treating physician. *Id.* at 459–64, 576–80, 627–28; *see also* Pl. Mem. at 11; Def.
Mem. at 11.  In deciding to give less than controlling weight to Dr. Dayal's opinions,
the ALJ was therefore required to explicitly consider the *Burgess* factors: "(1) the
frequen[cy], length, nature, and extent of treatment; (2) the amount of medical
evidence supporting the opinion; (3) the consistency of the opinion with the
remaining medical evidence; and (4) whether the physician is a specialist." *Estrella*,
925 F.3d at 95–96 (citation omitted); *see also Burgess*, 537 F.3d at 129.  While the
Second Circuit "does not require 'slavish recitation of each and every factor,' the
ALJ's 'reasoning and adherence to the regulation' still must be clear from his
opinion." *Cabrera v. Comm'r of Soc. Sec.*, No. 16-CV-4311 (AT) (JLC), 2017 WL
3686760, at *3 (S.D.N.Y. Aug. 25, 2017) (citing *Atwater v. Astrue*, 512 F. App'x. 67,
70 (2d Cir. 2013)).  If the ALJ does not "explicitly" consider these factors, the case
must be remanded unless "a searching review of the record" assures the Court that
the ALJ applied "the substance of the treating physician rule." *Estrella*, 925 F.3d at
95.

Here, in giving Dr. Dayal's opinions less-than-controlling weight, the ALJ
failed to weigh the following three *Burgess* factors: (1) the frequency of examination
and the length, nature, and extent of treatment relationship; (2) the evidence
supporting the opinions; and (3) whether the physician is a specialist.

First, the ALJ did not explicitly consider Dr. Dayal's extensive length and
frequency of treatment of Obremski.  *See, e.g., Ramos v. Comm'r of Soc. Sec.*, No. 13-
CV-3421 (KBF), 2015 WL 7288658, at *7 (S.D.N.Y. Nov. 16, 2015) (remanding in

part because ALJ did not consider length of plaintiff and treating physician's relationship).  Under the treating physician rule, Dr. Dayal's opinions are entitled to greater weight if he has "reasonable knowledge" of Obremski's impairments.  20 C.F.R. § 404.1527(c)(2)(ii).  Accordingly, the ALJ was required to consider how Dr. Dayal was uniquely situated to opine as to Obremski's symptoms given that he was Obremski's vascular surgeon who treated him immediately following the date of onset.  AR at 627, 463–64.  By failing to do so, the ALJ committed error.  *See, e.g.,* *Mongeur*, 722 F.2d at 1039 n.2 ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient."); *Pantoja Santiago v. Commissioner*, No. 18-CV-1226 (KPF) (BCM), 2019 WL 6831533, at *15 (S.D.N.Y. July 23, 2019) ("The treating physician rule recognizes that a treating source is 'most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . .'" (quoting 20 C.F.R. §§ 404.1527(c)(2) (2012), 416.927(c)(2) (2012)), *adopted by* 2019 WL 3798055 ( S.D.N.Y. Aug. 13, 2019).  The ALJ's failure to explicitly consider Dr. Dayal's long-term observations of Obremski's condition and his relative improvement or regression over time is exacerbated by the fact that she discounts his opinions based on the opinion of one-time consultative examiner Dr. Teli.  *Id.* at

23–24; *see also Estrella*, 925 F.3d at 98 (opinion of one-time consultative examiner did not provide "good reason" for minimizing opinion of treating source).

Second, the ALJ erred by not considering the consistency between Dr. Dayal's 2016 and 2017 assessments and the record as a whole concerning Obremski's limitations. *Id.* at 459–60; 576–80. While the ALJ can choose not to afford controlling weight to the treating physician's opinions if his views are "not consistent with other substantial evidence in the record," including "the opinions of other medical experts," *Halloran*, 362 F.3d at 32 (citation omitted), that is not the case here. In his 2016 opinion, Dr. Dayal found that Obremski had manipulative limitations and push and pull limitations and was "unable to work." AR at 460. In his 2017 assessment, Dr. Dayal opined that Obremski's symptoms would increase if placed in a competitive work environment when he is limited to lifting and carrying up to five pounds occasionally and can never or rarely use his right hand for fine manipulations. *Id.* at 578–79. Dr. Dayal's 2017 findings were based on the results of an angiogram of the right upper extremity, a noninvasive vascular study, and clinical evidence of tenderness and hyperesthesia of the right hand third, fourth, and fifth fingertips. *Id.* at 576.

Consistent with Dr. Dayal's findings, Dr. Gross also found marked limitations, opining that Obremski was essentially precluded in using his right fingers and hands for fine manipulation as well as turning and twisting objects with his right and left hand, and that he was limited to sitting and standing/walking for up to one hour in an eight-hour day. *Id.* at 618–20. Dr. Goldberg, who treated

Obremski since 2013, also documented Obremski's pain and difficulty when opening handles, particularly in cold weather. *Id.* at 568. The ALJ failed to recognize that Dr. Gross's opinion corroborated Dr. Dayal's 2017 findings, and instead omitted any discussion of these consistent findings in determining that Dr. Dayal's second opinion was not consistent with the "record as a whole." *Id.* at 23.

The ALJ also failed to consider Obremski's own statements about his ability to use his right hand, which also corroborated Dr. Dayal's findings that he was rarely able to use his right hand for fine manipulations. *See, e.g., id.* at 214 (testifying that his right third, fourth, and fifth fingers and "the tips are numb pretty much all the time"), 215 (reporting that it impacts his ability to use his hands "like [to] grab stuff and hold stuff"), 216 (reporting that he attempts to fold laundry but it is difficult "to grip because it's too thin"). While the ALJ may have found Obremski not entirely credible, she should have acknowledged this consistent testimony when determining the weight afforded to Dr. Dayal's 2017 opinion. In sum, the ALJ failed to consider this *Burgess* factor by omitting any reference to the evidence in the record supporting Dr. Dayal's opinions.

Third, the ALJ erred by not explicitly acknowledging Dr. Dayal's professional specialization as a vascular surgeon in weighing his opinion. *See, e.g., Selian*, 708 F.3d at 418 (citing *Burgess,* 537 F.3d at 129). Failure to explicitly weigh a treating physician's specialty when affording less than controlling weight is an error that warrants remand. *See, e.g., Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 266–67 (S.D.N.Y. 2016) (ALJ's failure to consider factors such as specialization in

assessing weight afforded to treating physician's medical opinion warranted remand); *Veresan v. Astrue,* No. 06-CV-5195 (JG), 2007 WL 1876499, at *5 (E.D.N.Y. June 29, 2007) (failure to "indicate what weight, if any, was given to the fact that those doctors are specialists" made it impossible "to determine the extent to which the ALJ considered those factors in reaching its [sic] determination . . . ."). Accordingly, the ALJ erred by affording Dr. Dayal's opinion limited weight without considering his specialty in vascular surgery.

In sum, the ALJ's failure to analyze three of the four *Burgess* factors before giving Dr. Dayal's 2016 and 2017 opinions less-than-controlling weight are legal errors that warrant remand. *See, e.g., Ramos*, 2015 WL 7288658, at *7 (remanding where ALJ did not consider specialization and length of treatment in weighing opinion of treating physician); *Clark v. Astrue*, No. 08-CV-10389 (LBS), 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010) (failure to consider "whether the opinion was from a specialist" was "legal error [that] constitute[d] grounds for remand") (internal quotation marks omitted).

### b. The ALJ Failed to Provide Good Reasons for Assigning Less Than Controlling Weight to Dr. Dayal's Opinions

Moreover, the ALJ failed to provide good reasons for the weight she accorded to Dr. Dayal's opinions. *See, e.g., Snell,* 177 F.3d at 133 ("Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for a remand.") (citing *Schaal*, 134 F.3d at 505). Here, the ALJ assigned "some weight" to Dr. Dayal's 2017 opinion on the grounds that "the clinical examination findings and the record as a whole are not consistent with no or rare use of the hand." AR at

23.  Dr. Dayal's findings were based on the angiogram of the right upper extremity, a noninvasive vascular study, and clinical evidence.  *Id.* at 576.  Dr. Gross's findings on the positive rheumatoid factor and evidence of pain and limited movement supported Dr. Dayal's findings.  *See, e.g., id.* at 615–20.  Dr. Goldberg also documented Obremski's complaints of pain and difficulty when opening handles, particularly in cold weather.  *Id.* at 568.  Additionally, Dr. Jung opined that Obremski has sensory loss in median nerve distribution in his right dominant hand, and is therefore limited in his ability to grasp, push/pull, lift/carry, or do other activities.  *Id.* at 465.  Therefore, Dr. Dayal's finding of no or rare use of the right hand for fine manipulations is consistent with several findings in the record from Dr. Gross, Dr. Goldberg, and Dr. Jung.

The Commissioner contends that the ALJ "appropriately gave 'little weight'" to Dr. Dayal's 2016 assessment that Obremski was "unable to work."  Def. Mem. at 11; AR at 460.  In response, Obremski argues the treating medical source findings cannot be discounted on the primary basis that a finding of disability is reserved to the Commissioner.  Pl. Reply at 2–3.  On this point, the Court concludes that the ALJ appropriately provided "little weight" to the 2016 assessment because the dispositive question of disability is reserved to the Commissioner as a matter of law.  20 C.F.R. § 404.1527(d) ("We will not give any special significance to the source of an opinion on issues reserved to the Commissioner . . ."); *see also Killings v. Comm'r of Soc. Sec.*, No. 15-CV-8092 (AT) (JCF), 2016 WL 4989943, at *13 (S.D.N.Y. Sept. 16, 2016) (because issue of whether plaintiff is able to work is reserved to

Commissioner, ALJ "was not required to give [treating physician's opinion] special weight"), *adopted by* 2016 WL 6952342 (S.D.N.Y. Nov. 28, 2016).  However, while the ALJ need not credit Dr. Dayal's opinion on this issue, that "does not exempt administrative decision makers from their obligation . . . to explain why a treating physician's opinion is not being credited."  *Snell*, 177 F.3d at 134.

Similarly, the lack of a function-by-function analysis by Dr. Dayal is not a good enough reason for discounting his opinion, as the Commissioner contends. Def. Mem. at 11; *see also Laureano v. Comm'r of Soc. Sec.*, No. 17-CV-1347 (SDA), 2018 WL 4629125, at *13 (S.D.N.Y. Sept. 26, 2018) (ALJ erred by assigning "limited weight" to treating physician's opinion when physician did not perform function-by-function analysis).  The ALJ, consistent with her duty to develop the record, should have affirmatively sought such a function-by-function analysis instead of largely disregarding Dr. Dayal's findings.  *Laureano*, 2018 WL 1445572, at *13; *see also Parker v. Comm'r of Soc. Sec. Admin.*, No. 18-CV-3814 (PAE) (HBP), 2019 WL 4386050, at *8 (S.D.N.Y. Sept. 13, 2019).[19]  Moreover, there is no *per se* rule requiring remand when an ALJ does not perform a function-by-function analysis in making a disability determination.  *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).  It therefore follows that there is no *per se* rule requiring a treating physician's opinion to be "totally disregarded for failure to perform that exercise."

---

[19] Additionally, there are other function-by-function analyses from other physicians with access to Obremski's full medical history, such as Dr. Gross's Rheumatoid Arthritis Impairment Questionnaire.  *See* AR at 617–21.

*Stango v. Colvin*, No. 14-CV-1007 (CSH), 2016 WL 3369612, at *11 (D. Conn. June

17, 2016); *see also Parker,* 2019 WL 4386050, at *8.

### c. The ALJ Failed to Properly Weigh Dr. Teli's Opinion

Obremski also argues the ALJ "improperly weighed" the opinion of Dr. Teli

because: (1) ALJs should not rely heavily on one-time consultative physicians;

(2) the ALJ failed to properly consider Dr. Teli's internist specialty; and (3) without

the records or diagnostic testing, Dr. Teli failed to properly evaluate the "full picture

of the severity" of all of Obremski's conditions.  *See* Pl. Mem. at 15–16.

An ALJ is permitted to accord significant weight to a consulting examiner's

opinion when it is supported by substantial evidence.  *See, e.g., Colbert v. Comm'r of

Soc. Sec.*, 313 F. Supp. 3d 562, 577 (S.D.N.Y. 2018) (no error in according "great

weight" to consultative examiner's opinion where opinion supported by record).

However, the Second Circuit has "cautioned that ALJs should not rely heavily on

the findings of consultative physicians after a single examination."  *Selian*, 708 F.3d

at 419.  Dr. Teli only saw Obremski once for an evaluation, on February 21, 2017.

AR at 571–74.

Dr. Teli is an internist, as compared to the other physicians in the record who

specialize, such as Dr. Dayal, a vascular surgeon, and Dr. Goldberg, a

rheumatologist.  Notably, the ALJ failed to acknowledge any of the doctors'

specializations in her decision.

In addition, the ALJ accorded Dr. Teli's opinion "some weight" despite

recognizing that he was not provided any of Obremski's records or diagnostic tests

and that he did not consider Obremski's impairments "to the extent that the

evidence provides – such as rheumatoid arthritis, the claimant's treatment regimen, and the claimant's subjective complaints of pain." AR at 15, 24. Obremski argues that the ALJ therefore improperly weighed Dr. Teli's opinion given his failure to consider all of Obremski's impairments documented in the record, including his level of pain and resulting limitations. Pl. Mem. at 12. The Commissioner counters that the ALJ's decision to grant "some weight" to Dr. Teli's assessment was appropriate as it was supported by an in-person physical examination. Def. Mem. at 13.

It is true that Dr. Teli's lack of review of prior records does not require his opinion to be disregarded. *See, e.g., Marquez v. Colvin*, No. 12-CV-6819 (PKC), 2013 WL 5568718, *13 (S.D.N.Y. Oct. 9, 2013) (opinion of consultative physician need not be disregarded if physician directly examined claimant despite failing to review prior records). However, the ALJ should have considered whether Dr. Teli's opinion was adequately supported given his lack of review of Obremski's prior records, and remand is therefore appropriate on this ground as well. *See, e.g., Arzu v. Saul*, No. 19-CV-6451 (VSB) (BCM), 2020 WL 9596205, at *19 (S.D.N.Y. Nov. 20, 2020) (ALJ's failure to consider that consultative examiner did not review any relevant diagnostic imaging was "problematic") (citing *Mills v. Berryhill*, No. 15-CV-5502 (DLI), 2017 WL 1155782, at *10 (E.D.N.Y. Mar. 27, 2017), *adopted by* 2021 WL 1947290 (May 12, 2021).[20]

---

[20] Obremski separately argues that Dr. Teli's opinion is too vague to determine what activities he could perform in a work environment as it described him as only having a "mild" restriction for use of the right hand. Pl. Mem. at 16; AR at 573.

In sum, the ALJ improperly relied on Dr. Teli's opinion to discredit Dr. Dayal's assessments because Dr. Teli had not reviewed Obremski's medical records or diagnostic tests and failed to perform an analysis as to all of Obremski's impairments. In addition, the ALJ failed to consider the limited nature of Dr. Teli's consultative evaluation and his lack of a relevant specialization. These legal errors warrant remand.

### d. The ALJ's Application of the Treating Physician Rule Was Not Harmless Error

The ALJ's failure to properly analyze Dr. Dayal's opinions under the treating physician rule was not harmless. Indeed, the proper application of the treating physician rule is potentially dispositive in determining whether Obremski is disabled within the meaning of the Act. *See, e.g., Roman v. Saul,* No. 19-CV-3688 (JLC), 2020 WL 4917619, at *20 (S.D.N.Y. Aug. 21, 2020) (ALJ's analysis not harmless error because had ALJ credited treating physician's opinion, it may have resulted in conclusion that claimant could not work). As of 2017, Dr. Dayal opined that Obremski's pain resulted in extreme limitations, such as never or rare use of his right upper extremities to handle objects. AR at 577–78. This opinion is particularly significant in light of the vocational expert's testimony that a hypothetical person who can rarely use their dominant hand would be unable to perform any of the jobs identified at the hearing. *Id.* at 224. Therefore, it "'cannot

---

This argument lacks merit. Dr. Teli's report includes a thorough physical examination, and, *inter alia*, made direct observations of Obremski's ability to walk, stand, squat, rise from his chair, and get on and off the examination table. *See* AR at 571–73.

be said that the ALJ's analysis of [the treating physician's] opinion was harmless error because the [vocational expert] essentially testified that if these opinions were adopted, [Obremski] would be unable to work.'" *Pines v. Comm'r of Soc. Sec.*, No. 13-CV-6850 (AJN) (FM), 2015 WL 872105, at *10 (S.D.N.Y. Mar. 2, 2015) (citation omitted), *adopted by* 2015 WL 1381524 (Mar. 25, 2015)).[21]

### III. CONCLUSION

For the foregoing reasons, Obremski's motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should:

(1) Provide a comprehensive analysis, including explicit consideration of all of the *Burgess* factors, in determining how much weight to assign to Dr. Dayal's opinions;

(2) Develop the record by recontacting consultative examiner Dr. Teli to solicit a function-by-function assessment and a review of prior medical records to clarify his opinion as to the limitations caused by Obremski's impairments;

(3) Reassess Obremski's RFC in light of the appropriate weight to be given to each medical opinion; and

---

[21] Obremski also contends that the ALJ erred in her evaluation of his subjective statements. Pl. Mem. at 20. The Court declines to reach this argument given the other bases for remand discussed above. In any event, on remand, the ALJ should reevaluate Obremski's subjective statements after according the proper weight to his physicians' opinions and further development of the record.

(4) Reevaluate Obremski's credibility based on an accurate characterization of his treatment and the further development of the record.

The Clerk is directed to grant the motion at Docket Number 17, deny the Commissioner's cross-motion at Docket Number 23, and enter judgment for Obremski.

**SO ORDERED.**

Dated: July 27, 2021
　　　　New York, New York

_____
JAMES L. COTT
United States Magistrate Judge